1
2
3
4                      **UNITED STATES DISTRICT COURT**

5                          **DISTRICT OF NEVADA**

6

7  JAMEE DEIRDRE HUNDLEY,
   a.k.a. JAMES DERRICK HUNDLEY,
8
            Petitioner,                        3:16-cv-00646-HDM-WGC
9
   vs.
10                                             **ORDER**
   RENEE BAKER, *et al.*,
11
            Respondents.
12
   _____/
13

14

15 Introduction

16      This is a habeas corpus action brought by Nevada prisoner Jamee Deidre Hundley, also

17 known as James Derrick Hundley.  The respondents have filed a motion to dismiss, on statute of

18 limitations grounds.  The Court will grant the motion to dismiss and will dismiss this action.

19 Background

20      On January 8, 1996, The State charged Hundley with three counts of sexual assault involving

21 nine-year-old CL, and one count of gross misdemeanor child abuse involving four-year-old ML.  *See*

22 Amended Criminal Complaint, Exhibit 4 (ECF No. 19-4).  CL and ML, along with JL, were the

23 children of Hundley's girlfriend, Jennifer Lockamy; when the crimes were committed, Hundley lived

24 in Reno with Lockamy, CL, ML and JL.

25      After a preliminary hearing (*see* Transcripts of Preliminary Hearing, Exhibits 5 and 6 (ECF

26 Nos. 19-5, 19-6)), the State amended the charges, replacing the gross misdemeanor child abuse

charge with a charge of felony child abuse causing substantial bodily harm. *See* Second Amended Criminal Complaint, Exhibit 7 (ECF No. 19-7); Information, Exhibit 8 (ECF No. 19-8); Amended Information, Exhibit 26 (ECF No. 19-26); Second Amended Information, Exhibit 32 (ECF No. 19-32).

The case proceeded to trial in Nevada's Second Judicial District Court, in Washoe County, Nevada, in July 1996. *See* Transcripts of Trial, Exhibits 28, 29, 35 (ECF Nos. 19-28, 19-29, 20-1). The jury found Hundley guilty of all four charges. *See* Jury Verdicts, Exhibit 34 (ECF No. 20). Hundley was sentenced on August 30, 1996 (s*ee* Transcript of Sentencing, Exhibit 36 (ECF No. 20-2), as follows:

| | | |
|---|---|---|
| Count 1, sexual assault | - | life in prison, with the possibility of parole after 20 years; |
| Count 2, sexual assault | - | life in prison, with the possibility of parole after 20 years, consecutive to the sentence on Count 1; |
| Count 3, sexual assault | - | life in prison, with the possibility of parole after 20 years, concurrent with the sentences on Counts 1 and 2; |
| Count 4, child abuse causing substantial bodily harm | - | 144 months in prison, with the possibility of parole after 56 months, concurrent with the sentences on Counts 1, 2 and 3. |

*See* Judgment, Exhibit 37 (ECF No. 20-3).

Hundley appealed from his conviction. *See* Notice of Appeal, Exhibit 38 (ECF No. 20-4). The Nevada Supreme Court affirmed Hundley's conviction and sentence on April 21, 1999. *See* Order Dismissing Appeal, Exhibit 43 (ECF No. 20-9).

Hundley then took no further action regarding the case for more than a decade.

On November 20, 2012, Hundley filed a petition for writ of habeas corpus in the state district court. *See* Petition for Writ of Habeas Corpus, Exhibit 67 (ECF No. 21). The state district court denied the petition on March 19, 2013, ruling that it was barred by the state-law statute of limitations. *See* Order Denying Petition for Habeas Corpus (Post-Conviction), Exhibit 68 (ECF

No. 21-1).  Hundley appealed, and the Nevada Supreme Court affirmed on September 19, 2013.  *See* Order of Affirmance, Exhibit 76 (ECF No. 21-9).

Hundley filed a second state-court habeas petition on June 19, 2014.  *See* Petition for Writ of Habeas Corpus (Post-Conviction), Exhibit 80 (ECF No. 21-13).  Counsel was appointed, and Hundley filed a Supplemental Petition for Writ of Habeas Corpus.  *See* Supplemental Petition for Writ of Habeas Corpus (Post Conviction), Exhibit 102 (ECF No. 22-2).  The state district court dismissed that action as untimely and successive.  *See* Order, Exhibit 111 (ECF No. 22-11).  The Nevada Court of Appeals affirmed on December 29, 2015, ruling that Hundley's petition was procedurally barred.  *See* Order of Affirmance, Exhibit 129 (ECF No. 22-29).

This Court received Hundley's *pro se* habeas petition (ECF No. 2), initiating this action, on November 8, 2016.

On November 16, 2016, the Court screened Hundley's petition, and determined that it appeared to be barred by the statute of limitations.  *See* Order entered November 16, 2016 (ECF No. 8).  The Court granted Hundley an opportunity to show cause why the case should not be dismissed on that ground.  *See id.*  On December 30, 2016, Hundley responded, asserting a claim of actual innocence to overcome the statute of limitations bar.  *See* Motion to Show Cause (ECF No. 11).  On January 24, 2017, the Court ruled that, under the circumstances, the Court would be able to consider Hundley's claim of actual innocence with a more complete record, and with the respondents' argument, and the Court ordered respondents to respond to the petition.  *See* Order entered January 24, 2017 (ECF No. 13).

Respondents then filed their motion to dismiss (ECF No. 18) on June 8, 2017, asserting the statute of limitations.  Hundley filed an opposition to the motion to dismiss on August 7, 2017 (ECF No. 24).  Respondents filed a reply on September 28, 2017 (ECF No. 27).

Discussion

Statute of Limitations

The Antiterrorism and Effective Death Penalty Act (AEDPA), enacted in 1996, included a

one-year statute of limitations for federal habeas petitions challenging state convictions or sentences:

> (1)  A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of --

>> (A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

>> (B)  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

>> (C)  the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

>> (D)  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. 2244(d)(1).  Respondents contend that Hundley's petition is barred by the statute of limitations.

Hundley's direct appeal concluded on April 21, 1999, when the Nevada Supreme Court affirmed Hundley's conviction and sentence.  *See* Order Dismissing Appeal, Exhibit 43 (ECF No. 20-9).  Adding the ninety days within which a petition for a writ of certiorari could have been filed in the United States Supreme Court (*see* Supreme Court Rule 13), the date on which Hundley's conviction became final, for purposes of the AEDPA statute of limitations, was July 20, 1999.  Running from that date, without any tolling, the limitations period expired on July 20, 2000.

Hundley did not initiate a state-court habeas action until more than twelve years later, in 2012.  After the passage of that time, both of his state-court habeas actions were ruled untimely.  *See* Order of Affirmance, Exhibit 76 (ECF No. 21-9); Order of Affirmance, Exhibit 129 (ECF No. 22-29).  An untimely state post-conviction petition is not considered "properly filed," and does not afford the petitioner statutory tolling of the AEDPA statute of limitations.  *See* 28 U.S.C. § 2244(d)(2); *Pace v. DiGuglielmo*, 544 U.S. 408, 414 (2005).  Therefore, the AEDPA limitations

period continued to run.

Hundley signed his federal habeas petition on October 26, 2016, and mailed it for filing. More than 16 years had passed, after Hundley's conviction became final, before Hundley initiated this action.

A habeas corpus petitioner is entitled to equitable tolling of the AEDPA statute of limitations if the petitioner shows: "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace*, 544 U.S. at 418). Hundley does not make any argument for equitable tolling.

A federal habeas petitioner may also overcome the expiration of the AEDPA statute of limitations by making a showing of actual innocence. *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1928-35 (2013); *see also Lee v. Lampert*, 653 F.3d 929 (9th Cir. 2011). When an otherwise time-barred habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional error," the court may consider the petition on the merits. *See Schlup v. Delo*, 513 U.S. 298, 316 (1995). Under *Schlup*, a petitioner may overcome a procedural default or expiration of the statute of limitations by (1) producing "new reliable evidence [of innocence] -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial," *Schlup*, 513 U.S. at 324, and (2) showing "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id*. at 327. The *Schlup* standard permits review only in the "extraordinary" case. *Id*. at 324. The Supreme Court has cautioned that "tenable actual-innocence gateway pleas are rare." *McQuiggin*, 133 S.Ct. at 1928. "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id*. (citing *Schlup*, 513 U.S. at 329); *see also House v. Bell*, 547 U.S. 518, 538 (2006) (emphasizing that the *Schlup* standard is demanding and seldom met).

Hundley's sole response to the respondents' assertion of the statute of limitations defense is a claim of actual innocence. And, Hundley's claim of actual innocence is based entirely on a statement made by Jennifer Lockamy, the victims' mother, at Hundley's sentencing. *See* Opposition to Motion to Dismiss (ECF No. 24). Hundley claims that, at the sentencing, Lockamy testified that CL, JL and ML had recanted their testimony. *See id.*

CL testified at Hundley's trial. *See* Testimony of CL, Trial Transcript, July 23, 1996, Exhibit 28, pp. 163-89 (ECF No. 19-28). CL was nine years old in December 1995, when Hundley was arrested. *See id.* at 164. CL testified as follows:

Q.     Has anybody ever touched you in your vagina in a way you didn't like?

A.     Yes.

Q.     Who?

A.     Derrick [Hundley].

Q.     When did Derrick do that?

A.     All the time.

Q.     Where were you and he at when he touched your vagina

A.     In my -- in his room.

                                    *     *     *

Q.     All right. I'm going to show you what's been marked as State's Exhibit 12 for identification. Do you recognize that picture?

A.     Yes.

Q.     Who drew that picture?

A.     Me.

                                    *     *     *

Q.     [CL], what's this in the middle of the picture?

A.     A penis.

Q.     Okay. Whose penis?

A.     Derrick's [Hundley's].

Q.     All right.  What's this on my right side, your left side of the picture?  What's over here?

A.     Derrick going on the bed.

Q.     And this is [CL] in front of Derrick?

A.     Yes.

Q.     What are Derrick's legs doing in this picture?  Are they out straight, are they bent, or what are they doing?

A.     Separated.

Q.     What are you and Derrick doing in this picture? [CL], do you know you're not it trouble?

A.     Yes.

Q.     Do you have an answer?  Can you answer that question?  It's a hard one, I know.  How about if I break it up into little pieces, okay?  In this picture right here, did you have your clothes on or off?

A.     Off.

Q.     How did your clothes get off?

A.     I mean, on.

Q.     Okay.  All right.  That's all right.  Go slow.  Did Derrick have his clothes on or off?

A.     Just his T-shirt on.

Q.     Okay.  And do you know how his clothes got off?  Or were they ever on?

A.     They were on, but he took them off.

Q.     All right.  Whose bed is this?

A.     Derrick's.

Q.     Is that the one in his bedroom?

A.     Yes.

Q.     Okay.  And Derrick is on the bed with his legs spread; is that what you said?

A.     Yes.

Q.     What's Derrick doing?

A.     Laying on the bed.

Q.     Okay.  And what's [CL] doing?

A.     (No response.)

Q.     How about if we do it this way: When [CL] is right here, can she see Derrick's penis?

A.     Yes.

Q.     What does his penis look like when he's laying on the bed right there?

A.     What's drawn on the picture.

Q.     This one.  Okay.  It's all right.  Let's move to the other side.  Over on the other side, does Derrick have his clothes on or off here?

A.     On.

Q.     Okay.  And does [CL] have her clothes on or off?

A.     I took my pants off.

Q.     Your pants are on or off?

A.     Off.

                    *    *    *

Q.     In this picture, is any part of Derrick's body touching [CL]?

A.     Yes.

Q.     All right.  What part of Derrick's body is touching [CL]?

A.     His tongue.

Q.     And what part of his tongue is he touching [CL] with?  Or what part of [CL's] body is he touching her with?

A.     Vagina.

                    *    *    *

Q.     Now, in this picture, is Derrick's tongue inside of [CL's] vagina or outside of [CL's] vagina?

A.     In.

1                               *   *   *

2          Q.      How about over on this side now; is any part of [CL's] body touching
any part of Derrick's body?

3          A.      Yes.

4          Q.      What parts?

5          A.      My mouth.

6          Q.      Okay.  And what part of your body were you touching with your mouth
-- what part of his body were you touching with your mouth?  you want to point to the
7   picture.  This is the picture of the body, State's Exhibit 14. Can you just point?

8          A.      His penis (indicating).

9          Q.      All right.  And was his penis inside your mouth or outside of your
10  mouth?

11         A.      In.

12         Q.      [CL], did Derrick ever touch any other part of your body with his penis
other than your mouth?
13

14         A.      Yes.

15         Q.      What part?

16         A.      My vagina.

17         Q.      Did his penis go inside or was it outside of your vagina?

18         A.      Inside.

19         Q.      How many times did he touch your vagina with his tongue?

20         A.      I don't know.  I don't remember.

21         Q.      All right.  Was it one time only that he touched --

22         A.      No.

23         Q.      It was more than one time?

24         A.      Yes.

25         Q.      How many times did Derrick touch your vagina with his penis?

26         A.      I don't remember.

9

| | | | |
|---|---|---|---|
| 1 | Q. | One time only or more than one time? | |
| 2 | A. | More than one time. | |
| 3 | Q. | How many times did Derrick put his penis inside your mouth? | |
| 4 | A. | Don't remember. | |
| 5 | Q. | More than once? | |
| 6 | A. | Yes. | |

*   *   *

Q.    And did you ever tell your mom what was happening, [CL]?

A.    No.

Q.    Why didn't you tell your mom?

A.    I was afraid.

*   *   *

Q.    All right.  Do you remember telling Mr. Lipparelli – or pardon me, Detective Primus that Derrick asked you to keep it a secret?

A.    Yes.

Q.    Did he ask you to keep it a secret?

A.    Yes.

Q.    When was it that he asked you?  Was it the first time, the middle time, the last time?

A.    The first.

*Id*. at 171-79.  CL also testified about an occasion when Hundley exposed his penis to CL and JL.

*Id*. at 180.  CL also testified, as follows, that Derrick showered with her:

Q.    How did that happen that you took a shower with Derrick?  Whose idea was it, [CL]?

A.    Derrick's.

Q.    What did he say?

A.    He asked us who wants to take a shower?

10

| | |
|---|---|
| Q. | And who was the "us" that he asked? |
| A. | Me and my sister and my brother. |
| Q. | What did you say? |
| A. | Nothing. |
| Q. | What happened after you said nothing? |
| A. | He said "you"? |
| Q. | "You" meaning you, [CL]? |
| A. | Yes. |
| Q. | How did he say it? |
| A. | He told me. |
| Q. | Okay. What was his voice like? Let me ask a different question: What happened when you were in the shower? |
| A. | His penis started touching my vagina. |
| Q. | All right. And what did his penis look like when it was touching you? Could you see it? |
| A. | Yes. |
| Q. | What did it look like? |
| A. | It was straight up. |
| Q. | Was it hard or was it soft? |
| A. | Hard. |

*Id*. at 181-82. CL also testified that ML's arm was broken because Hundley "threw him across the room." *Id*. at 167-68. And, CL testified that ML had bite marks on his arm because Hundley bit him, and that ML had marks on his buttocks from Hundley "spanking him with a belt." *Id*. at 169. Finally, CL testified as follows:

| | |
|---|---|
| Q. | [CL], has anyone told you what to say here today? |
| A. | No. |
| Q. | Has your dad told you to come and say bad things about Derrick |

11

| | |
|---|---|
| 1 | [Hundley]? |
| 2 | A. No. |
| 3 | Q. Have any of your friends told you to come and say bad things about |
| 4 | Derrick? |
| 5 | A. No. |
| 6 | Q. [CL], would you say bad things about Derrick because you're angry with him? |
| 7 | A. No. |
| 8 | Q. Have you told us the truth? |
| 9 | A. Yes. |

*Id.* at 182-83.

ML also testified at Hundley's trial. *See* Testimony of ML, Trial Transcript, July 23, 1996, Exhibit 28, pp. 102-22 (ECF No. 19-28). ML was four years old in December 1995. *See id.* at 104-05. When asked about Hundley, ML testified: "sometimes he whooped me." *Id.* at 108. When shown photographs of injuries that he had in December 1995, ML testified that Hundley did that to him. *Id.* at 109. Asked the broken arm that he had in December 1995, ML testified: "I broke this one (indicating) because Derrick [Hundley] thrown me on the bed, and I rolled and it broke." *Id.* at 111; *see also id.* at 112 ("When he throwed me on the bed, I had -- I rolled and then -- then I hit my arm, and then I broke it."). Asked about marks on his buttocks, ML testified that Hundley had "whooped" him with a belt. *Id.* at 113; *see also id.* at 116 ("He whooped me with a belt buckle."). ML also testified that Hundley gave him "potty baths." *Id.* at 115-16. Asked how he felt about Hundley, ML testified "I hate him." *Id.* at 117.

JL also testified at Hundley's trial. *See* Testimony of JL, Trial Transcript, July 23, 1996, Exhibit 28, pp. 124-63 (ECF No. 19-28). JL was eight years old in December 1995. *See id.* at 124-25. JL testified that on one occasion she and CL were in Hundley's bedroom and Hundley pulled down his pants and exposed "his private parts" to them. *See id.* at 130-34. JL testified that Hundley took a shower with CL. *Id.* at 135-38, 154-55. JL testified that ML's arm was broken when Hundley

12

threw him on a bed and he hit his arm on a wall. *Id*. at 135-36, 145-46. JL testified that the bite

marks on ML's arm were from Hundley biting him. *Id*. at 138, 153-54. JL testified that Hundley

would "always" hit ML with a belt. *Id*. at 139. Asked about the "potty baths" that Hundley gave to

ML, JL testified as follows:

> Q.  [JL], have you ever heard the words "potty bath" before? Do you know what that means? I'm sorry, I didn't hear you.
>
> A.  Yes.
>
> Q.  What does it mean?
>
> A.  Take a bath in the toilet.
>
> Q.  All right. Did you ever see that happen to anybody?
>
> A.  Yes.
>
> Q.  Who?
>
> A.  My brother.
>
> Q.  When did that happen?
>
> A.  I don't know when it happened.
>
> Q.  Okay. how did it happen?
>
> A.  My brother would always go to the bathroom when he did piss in his pants, and Derrick [Hundley] would put him in the toilet and put cold water on him, flush it a couple times and then get him out and make him go outside naked.
>
> Q.  Go outside naked?
>
> A.  Uh-huh.
>
> Q.  Was it cold or warm outside?
>
> A.  Sometimes it was cold. Sometimes it would be hot.
>
> Q.  What did your brother do when he got the toilet flushed when he was in it?
>
> A.  He was crying.

*Id*. at 141-42. On cross-examination, when asked if she told her mother what happened, JL testified

13

as follows:

> Q. Well, did you tell your mom what happened?
>
> A. No.
>
> Q. Why not?
>
> A. Not about anything about what Derrick [Hundley] did to my brother or anything, because we were afraid that Derrick would hit us.
>
> Q. Did you tell your mom about seeing Derrick's penis?
>
> A. No.
>
> Q. Why not?
>
> A. We were scared.
>
> Q. Scared of what?
>
> A. Derrick would do something to us.
>
> Q. Were you afraid of your mom?
>
> A. No. Derrick.

*Id*. at 161-62.

Carla Blevins, a social worker employed at a Reno hospital, testified that on December 23, 1995, when she was working in the emergency room of the hospital, Hundley and Jennifer Lockamy brought ML into the hospital with an arm injury, and he was found to have a broken arm. *See* Testimony of Carla Blevins, Trial Transcript, July 23, 1996, Exhibit 28, pp. 13-38 (ECF No. 19-28). Blevins testified that, in addition to the broken arm, she saw bite marks on ML's left arm, bruises on his face, behind his ear, and near his armpit, redness in an eye, and "bruising stripe marks" on his buttocks and upper legs. *Id*. at 19-20. Lockamy denied knowing how those injuries had occurred. *Id*. at 23-25. Regarding the "bruising stripe marks," Blevins testified that Hundley told her: "Well, I give them whoopins." *Id*. at 26. Blevins also observed light bruising on CL similar to the bruising on ML's buttocks. *Id*. at 27. CL told Blevins that Hundley had caused the bruises; she said Hundley "whoops them with a belt." *Id*. at 30.

14

1    Donald Clark Cole, M.D., an emergency room doctor at the hospital, also testified at

2    Hundley's trial. *See* Testimony of Donald Clark Cole, M.D., Trial Transcript, July 24, 1996, Exhibit

3    29, pp. 3-27 (ECF No. 19-29). Dr. Cole observed that ML had several injuries, including the broken

4    arm, bite marks on one arm, "striping bruising" on his buttocks, hemorrhaging in an eye, bruising on

5    the side of his tongue, a bruise on the left side of his face, and a scratch behind his left ear. *Id*. at 5-

6    16. Dr. Cole suspected that ML had been subjected to child abuse. *Id*. at 16-17.

7    Larry Lipparelli, a social worker employed by the Washoe County Department of Social

8    Services, also testified at trial. *See* Testimony of Larry Lipparelli, Trial Transcript, July 23, 1996,

9    Exhibit 28, pp. 38-62 (ECF No. 19-28). Lipparelli testified that he interviewed ML, CL and JL on

10   December 26, 1995. *See id*. at 40. On ML, Lipparelli observed "some hemorrhaging in his right

11   eye," "some type of cast on his right arm," "a scrape behind his right ear," "a scrape on his face,"

12

13   "two bite marks on his arm," and "some bruising on his buttocks and leg and a bruise at the upper

14   base of his penis." *Id*. at 41. Lipparelli testified as follows about what the three children told him:

15   They told me on -- that this -- excuse me -- that they had been in the home
     with their mother and this gentleman for about three months -- or he had been there
16   for about three months and that during that time, they had been disciplined by him. A
     lot of times, they would be spanked with a belt and bruised. One of the daughters
17   said that she was given 30 -- I think it was 37, what she called "whoopins" for not
     holding onto a grocery cart, and it left bruising on her.
18
     They said that when [ML] soiled his pants, that he had to take what they called
19   "potty baths," which were cold or hot baths that the defendant gave them. If he
     screamed, then he would be dressed up like a girl with makeup. If he lied, then the
20   defendant would pull on his penis or pinch it.

21   In discussing any sexual abuse of the children, the two girls said that the
     defendant had exposed himself to them on one occasion, and on another occasion, he
22   took a shower with -- I believe it was [CL]. I'd have to look at which of the daughters
     it was. And described his penis as being erect.
23

24   *Id*. at 54-55. Asked about Jennifer Lockamy, Lipparelli stated: "She seemed to be more concerned

25   about the defendant than her own children." *Id*. at 57.

26   Keith Primus, who was a Reno police detective, testified at Hundley's trial. *See* Testimony

of Keith Primus, Trial Transcript, July 23, 1996, Exhibit 28, pp. 75-101 (ECF No. 19-28). Primus testified that he responded to the hospital emergency room where ML was on December 23, 1995. *See id*. at 77. Primus observed ML's injuries. *Id*. at 78. Primus then spoke with Hundley, who agreed to go to the police station to be interviewed. *Id*. at 78-79. A videotape of Primus' interview of Hundley was played before the jury. *Id*. at 81-82.

Kathleen Marie Peele, a registered nurse at WCC Saint, a medical clinic that did medical evaluations of children who may have been victims of sexual assault, testified that she examined CL on December 28, 1995. *See* Testimony of Kathleen Marie Peele, Trial Transcript, July 24, 1996, Exhibit 29, pp. 27-59 (ECF No. 19-29). CL told Peele that Hundley "had put his private thing and some other object inside of her." *Id*. at 32. CL told Peele she was "having abdominal or pelvic pain," as well as "dysuria, which is painful urination." *Id*. at 34. Peele believed that CL told her she was having vulvar discomfort and itching. *Id*. CL told Peele she felt anger toward Hundley. *Id*. at 35. CL told Peele that she was having problems with depression and self-abuse. *Id*. at 35-36. Peele found, as follows, that CL's hymen was abnormal:

> In her particular case, her hymen is what we call attenuated, so when I say to you attenuated, I mean this area between the vestibule and the hymen itself is very, is reduced in tissue. It is narrow, very narrow rimmed. In fact, there is very little hymenal tissue there, and it is abnormal in that, it is abnormal in its shape and it is missing some tissue.

*Id*. at 40. Asked what this finding meant to her as a sexual assault examiner, Peele testified:

> What that means to me is that some blunt object, blunt force object has gone inside of this child and has caused her to have lost some tissue that should be there that is no longer there.

*Id.* Peele testified that this would be consistent with a penis entering the vagina. *Id*. at 41. Asked further about the meaning of her findings, on cross-examination, Peele stated:

> I am saying that due to the lack of hymenal tissue that she has, I would be very concerned about something going inside of her more than one time.

*Id*. at 59.

Jennifer Lockamy, the mother of CL, JL and ML, testified for the defense. *See* Testimony of

16

Jennifer Lockamy, Trial Transcript, July 24, 1996, Exhibit 29, pp. 84-159 (ECF No. 19-29).

Lockamy testified that, after Hundley's arrest, and soon after CL was examined by Peele, she was allowed to visit with CL, JL and ML, with Lipparelli present. *See id*. at 102-03. Lockamy admitted that, during that visit, CL told her that Hundley had "touched her" and that she "had vaginal tissue damage." *Id*. at 103. Lockamy also admitted that CL answered "yeah" when Lipparelli asked her if "[Hundley] made [her] kiss his penis," if "[Hundley] kissed [her] vagina," and if "[Hundley] put his penis in [her] vagina." *Id*. Lockamy claimed that CL said she wanted to talk to her alone, but Lipparelli would not allow that. *Id*. Lockamy also claimed that she saw CL and JL bite ML. *See id*. at 106-07. Lockamy also claimed that CL and JL had told her a story different from their testimony regarding the incident when Hundley exposed himself to them; according to Lockamy, CL and JL told her that they had walked in on Hundley, in his bedroom, and Hundley was not wearing pants. *See id*. at 107-08. Lockamy testified, further, that, during the time her children lived with Hundley and her, she never saw any signs of physical abuse on the children. *See id*. at 108. Lockamy testified that when she found out about the bruises on ML's buttocks, she "was under the assumption that they happened when he fell down the stairs" on the evening of December 22, 1995. *See id*. at 115-17. She also testified that she thought ML broke his arm falling down the stairs. *See id*. at 116-19, 126. Lockamy testified that she loved Hundley and visited Hundley many times in jail between the time of the arrest and the trial; she did not dispute records that showed that she visited Hundley 64 times. *See id*. at 120, 122, 128-29. Lockamy testified that ML "had a habit of when he was bored he would be watching TV and pulling on his ear and he would get bruises behind his ear." *Id*. at 139. Lockamy testified that ML "was uncircumcized and we were having a problem with him keeping his penis clean and it would get to itching and he would pull on his penis and he would have bruises here." *Id*. Lockamy testified that she disputed Dr. Cole's suspicion that ML had been subject to abuse, and she disputed that it was Hundley who caused CL's abnormal hymen. *See id*. at 144-46.

Hundley's mother also testified for the defense. *See* Testimony of Judy Hundley, Trial Transcript, July 24, 1996, Exhibit 29, pp. 159-69 (ECF No. 19-29). She testified that she often cared

for the three children, and became close to them. *See id*. at 162-63. She testified that they played roughly; she testified that she saw ML hurt his eye, and she saw the two girls bite ML. *Id*. at 165-66. She testified that she never noticed any reluctance of the children to be with Hundley, and that, in fact, they "couldn't get enough of [Hundley]." *Id*. at 166-68.

Amy Harold also testified for the defense; she lived across the hallway from Lockamy and Hundley and the three children, and sometimes babysat the children. *See* Testimony of Amy Arlene Harold, Trial Transcript, July 25, 1996, Exhibit 35, pp. 11-21 (ECF No. 20-1). Harold testified that on one occasion, around Christmas 1995, her son bit ML, possibly on the shoulder. *See id*. at 13. However, on cross-examination, she testified that her son did not cause the bite marks that were discovered on ML at the hospital on December 23, 1995, or any of the other injuries to ML that were discovered then. *Id*. at 16-17. Harold testified that she believed CL, JL and ML were being treated very well at home, that they were happy, and that the children did not complain about Hundley or Lockamy mistreating them in any way. *Id*. at 14.

Hundley testified. *See* Testimony of James Derrick Hundley, Trial Transcript, July 25, 1996, Exhibit 35, pp. 22-114 (ECF No. 20-1). Hundley testified that he spanked ML on December 23, 1995. *See id*. at 28-30; *see also id.* at 85-88. Hundley testified that on December 23, 1995, he and the children were playing roughly, and he threw ML on a bed, and then ML complained about his arm hurting. *Id*. at 30-32; *see also id*. at 79-82. Hundley testified that he then took the children to pick Lockamy up from work, and to take ML to the hospital. *Id*. at 32-33. Hundley testified about going to the police station and being interviewed there. *Id*. at 33-37. While testifying, Hundley attempted to explain away his admission to the police -- seen by the jury on the video of the interview -- that he had bitten ML. *Id*. at 37; *see also id*. at 82-85. Hundley testified about the incident where CL and JL saw his penis, suggesting that, if that happened, they must have walked in on him without knocking. *Id*. at 43-44; 89-92. Hundley denied taking a shower with CL. *Id*. at 44-46. Hundley denied ever sexually molesting CL. *Id*. at 113.

The State re-called Lipparelli in its rebuttal case. *See* Testimony of Larry Lipparelli, Trial

Transcript, July 25, 1996, Exhibit 35, pp. 120-25 (ECF No. 20-1). In that testimony, Lipparelli

testified that Jennifer Lockamy told him that ML may have hurt himself falling down stairs, but he

found no evidence to corroborate her belief in that regard. *See id*. at 120-21. Lipparelli also testified

regarding his meeting with Lockamy and CL. *See id*. at 121-23. He testified that he encouraged CL

to tell her mother what she had told him, but that he did not tell her what to say. *Id*. at 122-23.

Hundley claims that Jennifer Lockamy's testimony at his sentencing was such that, had the

jury heard the testimony at trial, no juror, acting reasonably, would have found him guilty. At

Hundley's sentencing, Lockamy testified as follows:

> Q.      Miss Lockamy, when was the last time you saw your three children, [ML], [JL] and [CL]?
>
> A.      About two weeks ago.
>
> Q.      Okay. Do you know the exact dates when you saw them?
>
> A.      I believe it was the 18th, 19th and 20th [of August 1996].
>
> *      *      *
>
> Q.      Could you please describe for the Court what your children were like when you was them on the 18th, 19th and 20th?
>
> A.      We.., they were very happy to see me. They kept asking about Derrick [Hundley]. They wanted to know how he was and what was going on. I told them.
>
> It was actually a huge surprise. I thought the children were going to be, you know, angry, hateful towards Derrick, and it was just the opposite. They kept telling me things like how much they loved him, how much they missed him. You know, they wanted to talk to him, they wanted to write him letters, you know, that kind of thing.
>
> *      *      *
>
> Q.      Is there anything, Ms. Lockamy, that you would like to say to this Court, as the mother of [CL], [JL] and [ML], about Mr. Hundley and about this sentencing proceeding?
>
> A.      First of all, since my visit with my children, I'm more convinced than ever that he did not do this. I learned quite a bit from my children as to a lot of the things that happened, have happened to them since the start of this.
>
> I've known Derrick for two years, over two years. I have never seen any violence or, anger with him.

> I mean, it hasn't mattered so far, but I know he didn't do this. And my children pretty much have told me the same thing.

Transcript of Sentencing, Exhibit 36, pp. 5-7 (ECF No. 20-2). Hundley focuses especially on Lockamy's last statement -- that CL, JL and ML "pretty much have told me the same thing" -- characterizing this as a recantation of their testimony. *See* Opposition to Motion to Dismiss (ECF No. 24).

The Court finds that the testimony of Jennifer Lockamy at Hundley's sentencing -- hearsay testimony by a witness who had plainly sided with the defense -- falls substantially below the standard necessary to show actual innocence to overcome the statute of limitations bar of this action. The Court concludes that had the jury heard Lockamy's testimony that CL, JL and ML "pretty much" told her that Hundley "didn't do this", the jurors, acting reasonably, would not have reached a different result. The jury heard directly from CL, JL and ML -- they heard the children's believable, and well-corroborated first-person accounts of Hundley's abuse of them.

Furthermore, under *McQuiggin*, while Hundley's delay may not bar Hundley's claim of actual innocence to overcome the limitations bar, the timing of Hundley's petition is a factor bearing on the reliability of the evidence purporting to show actual innocence. *See McQuiggin*, 133 S.Ct. at 1928; *see also McQuiggin*, 133 S.Ct. at 1935 ("Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing."). Hundley's sentencing was on August 30, 1996. *See* Transcript of Sentencing, Exhibit 36 (ECF No. 20-2). Hundley waited more than twenty years after the sentencing -- more than seventeen years after Hundley's conviction became final -- before initiating a federal habeas corpus action and claiming, based on Jennifer Lockamy's testimony, actual innocence. In that time, Hundley has been unable to produce any evidence of the supposed recantation of the testimony of CL, JL and ML other than Lockamy's vague hearsay testimony at the sentencing.

The Court considers Hundley's delay in claiming actual innocence based on Lockamy's testimony as unreliable and Hundley has not made a showing, as required under *Schlup* and *McQuiggin*, of actual innocence, to overcome the statute of limitations bar. The Court finds that

Hundley's petition is barred by the statute of limitations.

Certificate of Appealability

The standard for issuance of a certificate of appealability is governed by 28 U.S.C. § 2253(c). The Supreme Court has interpreted section 2253(c) as follows:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. The issue becomes somewhat more complicated where, as here, the district court dismisses the petition based on procedural grounds. We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79 (9th Cir.2000). Applying this standard, the Court finds that a certificate of appealability is not warranted.

**IT IS THEREFORE ORDERED** that respondents' Motion to Dismiss (ECF No. 18) is **GRANTED**. This action is dismissed.

**IT IS FURTHER ORDERED** that petitioner is denied a certificate of appealability.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment accordingly.

Dated this 13th day of November, 2017.

Howard D McKibben

_____
UNITED STATES DISTRICT JUDGE

21